# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>Three USPS Priority Mail Express parcels, currently in the custody of the United States Postal Inspection Service, Los Angeles, California, as described more fully in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> Case No. 2:21-MJ-2599 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1) | Possession with Intent to Distribute and Distribution of a Controlled Substance; Conspiracy |
| 21 U.S.C. § 843(b) | Unlawful Use of a Communication Facility, Including Public and Private Mails, to Facilitate the Distribution of a Controlled Substance |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

/s/ Rex Castro
_____
*Applicant's signature*

Rex Castro, Inspector, United States Postal Inspection Service
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: Los Angeles, CA

_____
*Judge's signature*

Hon. Charles F. Eick, United States Magistrate Judge
*Printed name and title*

AUSA: Aron Ketchel x1019

## AFFIDAVIT

I, Rex Castro, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search three parcels – **SUBJECT PARCEL 1**, **SUBJECT PARCEL 2**, and **SUBJECT PARCEL 3** (the "**SUBJECT PARCELS**") shipped through the United States Postal Service ("USPS").  The **SUBJECT PARCELS** are currently in the custody of the United States Postal Inspection Service ("USPIS"), as described more fully in Attachment A, which is incorporated by reference.

2.    The requested search warrant seeks authorization to seize evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 846 (conspiracy to distribute and to possess with intent to distribute a controlled substance), and 843(b) (unlawful use of a communication facility, including the mails, to facilitate the distribution of a controlled substance), as described more fully below and in Attachment B, which is also incorporated by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR POSTAL INSPECTOR REX CASTRO

4.   I am a Postal Inspector with USPIS and have been so employed since August 2019.  I am currently assigned to the USPIS Los Angeles Division, Contraband Interdiction and Investigations ("CI2") team.  The CI2 team is responsible for investigating narcotics trafficked through the United States Mail.

5.   As part of my training to become a Postal Inspector, I completed a fourteen-week basic training course in Potomac, Maryland, which included training in the investigation of drug trafficking via the United States Mail.

6.   Since August 2019, I have participated in multiple investigations into violations of the Controlled Substances Act involving USPS and discussed my investigations with other experienced law enforcement officers and have gained knowledge and experience from them.  During my employment, I have written affidavits in support of complaints and search warrants, and executed numerous federal arrests, both as part of my own investigations and assisting in other investigations.  For these reasons, I am familiar with how drug traffickers use the mail to facilitate their trafficking.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    AIRRIS DEQUAN WILLIAMS("WILLIAMS"), a California state parole agent,[1] is believed to have mailed multiple packages containing cannabis from USPS facilities located in the Central District of California to locations across the country and to have received packages mailed from across the country containing bulk cash.

8.    On May 15, 2021, the United States Postal Inspection Service executed a search warrant for WILLIAMS and his residence located at 11136 Chandler Boulevard, Apartment 412, North Hollywood, California 91601 ("WILLIAMS's RESIDENCE"). During the search of the WILLIAMS's RESIDENCE, USPIS Postal Inspectors discovered two USPS receipts located on the kitchen table that indicated that **SUBJECT PARCEL 1** was mailed on or about May 12, 2021, and **SUBJECT PARCEL 2** and **SUBJECT PARCEL 3** were both mailed on or about May 11, 2021.

9.    During a preliminary search of WILLIAMS's phone pursuant to the warrant, I discovered a text message thread referencing the **SUBJECT PARCELS**. In the same text message thread, WILLIAMS and an unidentified individual appear to be discussing the contents of the parcels using coded language. Based upon my training and experience, and discussion with other law enforcement agents, I believe the text messages refer to product names for various marijuana related products.

---

[1] I understand that WILLIAMS has been administratively suspended from his position as a state parole agent following USPIS's search of WILLIAMS's residence described further below.

10.   Upon further review, the **SUBJECT PARCELS** bore suspicious characteristics that indicate the **SUBJECT PARCELS** contain contraband.

11.   On May 21, 2021, a trained drug detection dog alerted to **SUBJECT PARCEL 1** for the presence of drugs or other items, such as the proceeds of drug sales, which have been contaminated by drugs.  Although the drug detection dog did not alert to either **SUBJECT PARCEL 2** or **SUBJECT PARCEL 3**, there is probable cause to believe they both also contain contraband for the reasons described below.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Background on Use of Mails for Drug Trafficking**

12.   Based on my training and experience as a Postal Inspector, and the experiences related to me by fellow Postal Inspectors who specialize in drug investigations, I know the following:

a.   Los Angeles is a major source area for drugs. Drugs are frequently transported from Los Angeles through the United States Mail, and the proceeds from drug sales are frequently returned to Los Angeles through the mail.  These proceeds are generally in the form of cash, money orders, bank checks, or similar monetary instruments in an amount over $1,000.00.

b.   Drug distributors often use USPS Priority Mail Express, which is the USPS overnight/next day delivery mail product, or Priority Mail Service, which is the USPS two-to-three-day delivery mail product.  Drug distributors use the

Priority Mail Express delivery service because of its speed, reliability, and the ability to track the parcel's progress to delivery.  Drug distributors use the Priority Mail delivery service because it provides them more time for travel between states if they decide to follow their shipments to their destination for distribution.  Also, by adding delivery confirmation to a Priority Mail parcel, drug traffickers have the ability to track the parcel's progress to the intended delivery point, as if the parcel had been mailed using the Priority Mail Express Service.

13.  Based on my training and experience, and the collective experiences related to me by fellow Special Agents who specialize in investigations involving the mailing of controlled substances and proceeds from the sale of controlled substances, I know that the following indicia suggest that a parcel may contain drugs or drug trafficking proceeds:

a.   The parcel is contained in a box, flat cardboard mailer, or Tyvek envelope;

b.   The parcel bears a handwritten or typed label, whether USPS Express Mail or Priority Mail;

c.   The handwritten or typed label on the parcel does not contain a business account number;

d.   The seams of the parcel are all taped or glued shut;

e.   The parcel emits an odor of a cleaning agent or adhesive or spray foam that can be detected by a human; and

f.   Multiple parcels are mailed by the same individual, on the same day, from different locations.

14.   Parcels exhibiting such indicia are the subject of further investigation, which may include verification of the addressee and return addresses and examination by a trained drug-detection dog.

15.   I know from my training and experience that drug traffickers often use fictitious or incomplete names and addresses in an effort to conceal their identities from law enforcement officers investigating these types of cases.  To the extent that real addresses are ever used, it is only to lend a legitimate appearance to the parcel and is almost always paired with a false name.

**B.   Seizure of Prior Parcels Associated with WILLIAMS[2]**

16.   In approximately July 2020, USPS Inspector Lyndon Versoza ("Inspector Versoza") conducted a routine review of USPS databases and discovered that between approximately March 26, 2020, and May 11, 2020, WILLIAM's RESIDENCE received approximately thirteen USPS parcels that appeared to be suspicious based off characteristics that suggested they may contain contraband.  The database also revealed that a particular IP address (the "SUBJECT IP ADDRESS") had been used to track all thirteen of the parcels.

---

[2] The background of the investigation is described in more detail in the affidavit for the search warrant for WILLIAMS and WILLIAM's RESIDENCE, which is attached for the Court's reference as Exhibit A.

17.  I later determined based upon records provided by Bel
Air Internet that the subscriber for the SUBJECT IP ADDRESS was
WILLIAMS and the SUBJECT IP ADDRESS resolved back to WILLIAMS's
RESIDENCE.

18.  After locating a parcel that was destined for
WILLIAMS's RESIDENCE in August 2020, USPIS obtained a search
warrant for the parcel (the "August 2020 Parcel") issued by the
Honorable Alka Sagar, U.S. Magistrate Judge, in 2:20-MJ-04033.
That parcel contained $24,500 in U.S. currency.  In order not to
prejudice the ongoing investigation, the currency was re-
packaged inside the August 2020 Parcel and returned to the mail
stream so that it would be delivered to its intended recipient.

19.  In September 2020, based upon my review of postal
databases, I discovered that the SUBJECT IP ADDRESS was being
used to track a package shipped from the Los Angeles area to
Tennessee (the "September 2020 Parcel").  On or about September
16, 2020, the Honorable Pedro V. Castillo, U.S. Magistrate
Judge, issued a warrant permitting a search of the September
2020 Parcel in 2:20-MJ-04413.  The September 2020 Parcel
contained approximately 1,015 gross grams of suspected marijuana
vape cartridges and 2,347 gross grams of suspected cannabis
infused gummies, both of which were seized and stored as
evidence.

20.  In March 2021, based upon my review of postal
databases, I discovered that the SUBJECT IP ADDRESS was being
used to track two packages shipped from the Los Angeles area to
Michigan (the "March 2021 Parcels").

21.  On or about April 1, 2021, the Honorable Alexander F. MacKinnon, U.S. Magistrate Judge, issued a warrant permitting a search of the March 2021 Parcels in 2:21-MJ-1585.  The first March 2021 Parcel contained approximately 995 gross grams of a green leafy substance suspected to be marijuana and the second March 2021 Parcel contained approximately 1,015 gross grams of a green leafy substance suspected to be marijuana.  The contents of the March 2021 Parcels were seized and stored as evidence.

**C.   Search Warrant of WILLIAM's RESIDENCE and WILLIAM's Cellular Phone**

22.  On May 4, 2021, the Honorable Alka Sagar, U.S. Magistrate Judge, issued a warrant permitting a search of WILLIAMS in 2:21-mj-2204 and WILLIAM's RESIDENCE in 2:21-mj-2206, and USPIS executed the search warrant on May 14, 2021 (Exhibit A).

23.  During the search of WILLIAM's RESIDENCE, USPIS Postal Inspectors discovered multiple USPS postal receipts, two of which were for the March 2021 Parcels.

24.  USPIS Postal Inspectors also discovered two additional USPS receipts located on the kitchen table which showed **SUBJECT PARCEL 1** was mailed on May 12, 2021, and **SUBJECT PARCEL 2** and **SUBJECT PARCEL 3** were both mailed on May 11, 2021.

25.  During a preliminary search of WILLIAMS's phone conducted pursuant to the search warrant, I discovered a text message thread that appeared to reference the **SUBJECT PARCELS**. Specifically:

    a.   Text messages sent by an unidentified individual "JOSH" to WILLAIMS at or around 7:15 a.m. on May 10, 2021, stated:

JOSH: "$100 to send [brown box emoji] Off out $100 n pockets & Use the rest n Grabz me sum Terps Frm the same store Wea we Got carts Frm"

JOSH: "Send ErrthanG out 2mara"

    b.   Text messages sent by JOSH to WILLIAMS at or around 9:02 a.m. on May 10, 2021, stated:

JOSH: "30 ML & 100ML

       Wedding Cake

       Runtz

       Cookies

     Skywalker OG"

JOSH: "Need those terps Frm the store"

JOSH: "Kuzzo"

WILLIAMS: "Ok"

WILLIAMS: "It's gone cost way more than $100 to send all that stuff"

JOSH: "Welpppppppp SOOO"

JOSH: "DATZZZ KOOOO KUZZZOOOO"

JOSH: "Wayyy more izzz lyk $2-300 more!!! But two medium [brown box emoji] Gone hit round $160 $170"

26.  Based on my training and experience, and discussions with other law enforcement, I understand the term "terps" to refer to terpenes, which are the essential oils present in cannabis plants that give the plant individual characteristics

such as flavor and aroma.  I further understand the term "carts" to refer to vape cartridges, which can be preloaded with cannabis oil.

27.   The initial message sent by JOSH suggest that he is providing WILLIAMS with a list of preloaded vape cartridges to purchase that contain different favored cannabis terpenes.  Vape cartridges with "The Skywalker OG" name written on them mentioned in the text message were also found and seized in the September 2020 Parcel.

28.   Text messages sent by JOSH to WILLIAMS at or around 1:36 p.m. on May 11,2021, stated:

JOSH: "3001 Hamilton Church Rd

     Antioch TN unit 421"

JOSH: "Use The Same B.S Nameski We Been UsinG Thoski"

JOSH: "Lemme knw Wen otw to Get Terps"

JOSH: "Grab em Today's"

WILLIAMS: "Shipping 230"

JOSH: "Terp Flavors

     Skywalker OG

     Wedding Cake

     Cookies

     Pink Runtz"

JOSH: "50 ml of each kind"

JOSH: "Add a OG On there as well… 50 ml"

WILLIAMS: "What kind of og"

JOSH: "Ask em wud kinda OG Dey Gotskii"

WILLIAMS: "A fb, OG Kus, OG haze, jack Herrera, gorilla
glue"

WILLIAMS: "Hardcore OG"

WILLIAMS: "I just got gorilla"

29.  The address "Church Rd" referenced by JOSH is the same recipient address found on all three of the **SUBJECT PARCELS**.  In the text messages, JOSH appears to tell WILLIAMS to write false names on the parcel labels for the **SUBJECT PARCELS**.  As described below, the recipients on the SUBJECT PARCELS do not appear to be associated with the recipient address.

30.  In a subsequent text message sent at or around 10:18 p.m. on May 11,2021, WILLIAMS appears to send the USPS tracking numbers for **SUBJECT PARCEL 2** and **SUBJECT PARCEL 3** to JOSH:

WILLIAMS: "9505515067421131471618"

WILLIAMS: "9505515067421131471625"

31.  In a text message sent at or around 9:20 a.m. on May 12, 2021, WILLIAMS appears to ask JOSH where to send additional suspected marijuana products:

WILLIAMS: "Send the terps to the same addy?"
JOSH responded by "liking" WILLIAMS's message, which I understood to mean that JOSH was confirming the product be sent to the Church Road address that was referenced in a prior text message.

32.  WILLIAMS sent a text message to JOSH at or around 5:09 p.m. on May 12,2021, that appears to contain the tracking number for **SUBJECT PARCEL 1**:

WILLIAMS: "9505515072961132929104"

**D.   Investigation into the SUBJECT PARCELS**

33.   On May 14, 2021, I reviewed postal databases and learned the **SUBJECT PARCELS** were scheduled for delivery at a post office located at 5424 Bell Forge Lane East, Antioch, Tennessee, 37013.

34.   On May 17, 2021, I spoke to a supervisor at the Antioch post office who agreed to send the **SUBJECT PARCELS** back to me at the USPIS office located in Los Angeles, California for further investigation.

35.   On May 21, 2021, I received the **SUBJECT PARCELS** and noticed characteristics described below that suggested they contained contraband.

**E.   Investigation of SUBJECT PARCEL 1**

36.   **SUBJECT PARCEL 1**, bearing the tracking number 9505 5150 7296 1132 9291 04, has the following characteristics suggesting it contains contraband:

a.   **SUBJECT PARCEL 1** is a USPS Priority Mail large, flat-rate box being shipped using USPS Priority Mail service.

b.   The sender and recipient information was written by hand.

c.   **SUBJECT PARCEL 1** was mailed using Priority Mail service with no business account number.

d.   I searched the CLEAR database using the sender listed on **SUBJECT PARCEL 1**, which was "T. Mitchell 514 N Mariposa st. Burbant, cA 91500." The CLEAR search revealed that

the name "T. Mitchell" was not associated with the sender address listed on **SUBJECT PARCEL 1**.

e.   I searched the CLEAR database using the recipient address listed on **SUBJECT PARCEL 1**, which was: "ROBERT MITCHELL 3001 Hamilton CHURCH rd. # 421 Antioch, TN 37013."  The CLEAR search revealed that the name "ROBERT MITCHELL" was not associated with the recipient address listed on **SUBJECT PARCEL 1**.

**F.   Investigation of SUBJECT PARCEL 2**

37.   **SUBJECT PARCEL 2,** bearing the tracking number 9505 5150 6742 1131 4716 18, has the following characteristics suggesting it contains contraband:

a.   **SUBJECT PARCEL 2** is a Mover One brown medium cardboard box being shipped using USPS Priority Mail service.

b.   The sender and recipient information was written by hand.

c.   **SUBJECT PARCEL 2** was mailed using Priority Mail service with no business account number.

d.   The seams of **SUBJECT PARCEL 2** were taped shut.

e.   I searched the CLEAR database using the sender listed on **SUBJECT PARCEL 2**, which was "T. Mitchell 514 N Mariposa St. Burbank, cA 91506."  The CLEAR search revealed that the name "T. Mitchell" was not associated with the sender address listed on **SUBJECT PARCEL 2**.

f.   I searched the CLEAR database using the recipient address listed on **SUBJECT PARCEL 2**, which was: "J. Mitchell 3001 Hamiltin church rd. # 421 Antioch, TN 37013."  The CLEAR search

13

revealed that the name "J. Mitchell" was not associated with the recipient address listed on **SUBJECT PARCEL 2**.

g.   The recipient and sender information for **SUBJECT PARCEL 2** was the same as **SUBJECT PARCEL 1**.

**G.   Investigation of SUBJECT PARCEL 3**

38.   **SUBJECT PARCEL 3**, bearing the tracking number 9505 5150 6742 1131 4716 25, has the following characteristics suggesting it contains contraband:

a.   **SUBJECT PARCEL 3** is a large brown cardboard box being shipped using USPS Priority Mail service.

b.   The sender and recipient information was written by hand.

c.   **SUBJECT PARCEL 3** was mailed using Priority Mail service with no business account number.

d.   The seams of **SUBJECT PARCEL 3** were taped shut.

e.   I searched the CLEAR database using the sender listed on **SUBJECT PARCEL 3**, which was "Tony Mitchell 514 N Mariposa st. Burbant, cA 91506."  The CLEAR search revealed that the name "Tony Mitchell" was not associated with the sender address listed on **SUBJECT PARCEL 3**.

f.   I searched the CLEAR database using the recipient address listed on **SUBJECT PARCEL 3**, which was: "Robert Mitchell 3001 Hamilton church rd # 421 Antioch, TN 37013."  The CLEAR search revealed that the name "Robert Mitchell" was not associated with the recipient address listed on **SUBJECT PARCEL 3**.

g.   The recipient and sender information for **SUBJECT PARCEL 3** was similar to the recipient and sender information for both **SUBJECT PARCEL 1** and **SUBJECT PARCEL 2** – the names were slightly different on **SUBJECT PARCEL 3** but the sender address and recipient address were both the same as the other **SUBJECT PARCELS.**

**H.    A Drug-Detection Dog Alerted to SUBJECT PARCEL 1**

39.   On May 21, 2021, based on the suspicious characteristics of the **SUBJECT PARCELS**, Los Angeles Police Department Officer Brett Coffey and his trained drug-detection dog, "Pete" examined the exterior of the **SUBJECT PARCELS.**

40.   Attached as Exhibit B, and incorporated by reference, is a true and correct copy of an affidavit by Officer Coffey. In this affidavit, Officer Coffey describes his training and experience with drug-detection dogs. He also confirms that Pete is a certified drug-detection dog.

41.   USPIS Postal Inspector Michael Reilly was present when Officer Coffey and Pete examined the **SUBJECT PARCELS**.  Officer Coffey informed Inspector Reilly, and later myself via text message, that Pete gave a positive alert to **SUBJECT PARCEL 1**, indicating the presence of drugs or other items such as the proceeds from the sale of drugs, which have been recently contaminated by or associated with the odor of drugs.  Officer Coffey further stated that Pete did not give a positive alert on either **SUBJECT PARCEL 2** or **SUBJECT PARCEL 3**.

42.   While the drug detection dog did not give a positive alert to either **SUBJECT PARCEL 2** or **SUBJECT PARCEL 3,** I believe

there is probable cause to believe **SUBJECT PARCEL 2** and **SUBJECT PARCEL 3** both contain contraband and/or evidence related to the ongoing investigation for the following reasons:

a.   a drug-detection dog alerted to **SUBJECT PARCEL 1**;

b.   both **SUBJECT PARCEL 2** and **SUBJECT PARCEL 3** were scheduled to be delivered to the same recipient address as **SUBJECT PARCEL 1**; and

c.   both **SUBJECT PARCEL 2** and **SUBJECT PARCEL 3** bore indicia of drug trafficking as described above in paragraphs 37 and 38 above.

d.   WILLIAMS appeared to reference both **SUBJECT PARCEL 2** and **SUBJECT PARCEL 3** in the same text message thread as **SUBJECT PARCEL 1**, in which it appears WILLIAMS was discussing the shipment of marijuana products with "JOSH", an unidentified individual.

///

///

///

## V. <u>CONCLUSION</u>

43.   For the reasons above, there is probable cause to believe that the **SUBJECT PARCELS**, as described in Attachment A, contain evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 846 (conspiracy to distribute and to possess with intent to distribute a controlled substance), and 843(b) (unlawful use of a communication facility, including the mails, to facilitate the distribution of a controlled substance), as described in Attachment B.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of May,
2021.


_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PARCELS TO BE SEARCHED

**A. SUBJECT PARCEL 1**, described as follows: One USPS Priority Mail parcel bearing label number 9505 5150 7296 1132 9291 04, weighing approximately 4 pounds, 1.80 ounces, postmarked on May 12, 2021, in Camarillo, California, and which bears a handwritten label with the recipient information listed as "ROBERT MITCHELL 3001 HAMILTON CHURCH rd. # 421 Antioch, TN 37013" and with a sender/return address listed as "T. Mitchell 514 N Mariposa st. Burbant, cA 91500." **SUBJECT PARCEL 1** bears U.S. Postage of $21.90.

**SUBJECT PARCEL 1** is currently in the custody of the United States Postal Inspection Service in Los Angeles, California.

**B. SUBJECT PARCEL 2**, described as follows: One USPS Priority Mail parcel bearing label number 9505 5150 6742 1131 4716 18 weighing approximately 34 pound, 8.0 ounces, postmarked on May 11, 2021, Sun Valley, California and which bears a handwritten label with the recipient information listed as "J. Mitchell 3001 Hamiltn church rd. # 421 Antioch, TN 37013," and with a sender/return address listed as "T. Mitchell 514 N Mariposa St. Burbank, cA 91506." **SUBJECT PARCEL 2** bears U.S. Postage of $96.25.

**SUBJECT PARCEL 2** is currently in the custody of the United States Postal Inspection Service in Los Angeles, California.

   **C. SUBJECT PARCEL 3**, described as follows: One USPS
Priority Mail parcel bearing label number 9505 5150 6742 1131
4716 25, weighing approximately 56 pounds, 10.2 ounces,
postmarked on May 11, 2021, in Sun Valley, California and which
bears a typed label with the recipient information listed as
"Robert Mitchell 3001 Hamilton church rd # 421 Antioch, TN
37013," and with a sender/return address listed as "Tony
Mitchell 514 N Mariposa st. Burbant, cA 91506." **SUBJECT PARCEL
3** bears U.S. Postage of $131.85.

   **SUBJECT PARCEL 3** is currently in the custody of the United
States Postal Inspection Service in Los Angeles, California.

## ATTACHMENT B

ITEMS TO BE SEIZED

The following items are to be seized from the parcel described in Attachment A, which constitute evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 846 (conspiracy to distribute and to possess with intent to distribute a controlled substance), and 843(b) (unlawful use of a communication facility, including the mails, to facilitate the distribution of a controlled substance):

      a.   Any controlled substances;

      b.   Currency, money orders, bank checks, or similar monetary instruments in quantities over $1,000; and

      c.   Packaging material.

# EXHIBIT A

Case 2:21-mj-02599-DUTY   Document 1   Filed 05/26/21   Page 23 of 61   Page ID #:23
AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/19)
Page ID #:1

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of ) <br><br> *(Briefly describe the property to be searched or identify the* <br> *person by name and address)* ) <br> ) <br> 11136 CHANDLER BOULEVARD, APT. 412, ) <br> NORTH HOLLYWOOD, CA 91601, as further ) <br> described in Attachment A-2 ) | Case No.   2:21-mj-2206 |

**FILED**
CLERK, U.S. DISTRICT COURT

May 4, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CD _____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 846, 841 | Conspiracy to distribute controlled substance |
| 18 U.S.C. § 843(b) | Use of mails to distribute controlled substance |
| 18 U.S.C. § 1956 | Money laundering |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

/s/ Rex Castro
*Applicant's signature*

Rex Castro, USPIS Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   May 4, 2021

*Judge's signature*

City and state: Los Angeles, CA

Honorable Alka Sagar, United States Magistrate Judge
*Printed name and title*

AUSA: Aron Ketchel x1019

## **AFFIDAVIT**

I, Rex Castro, being duly sworn, declare and state as follows:

## **I.** **PURPOSE OF AFFIDAVIT**

1.    This affidavit is  made in support of warrants to search AIRRIS DEQUAN WILLIAMS ("**WILLIAMS**"), as further described in Attachment A-1, and his residence located at 11136 Chandler Boulevard, Apartment 412, North Hollywood, California 91601 (the "**SUBJECT PREMISES**"), as further described in Attachment A-2.

2.    The requested warrants seek authorization to seize evidence, contraband, fruits, and instrumentalities of violation of 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute a Controlled Substance), 846 (Conspiracy to Commit Controlled Substance Offense), 843(b) (Unlawful Use of a Communication Facility, Including the Mails, to Facilitate the Distribution of a Controlled Substance), and 18 U.S.C. § 1956 (Money Laundering), as described below and in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR POSTAL INSPECTOR REX CASTRO

4.    I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since August 2019.  I have completed a fourteen-week basic training course in Potomac, Maryland, which included training in the investigation of drug trafficking via the United States Mail.  I am currently assigned to the USPIS Los Angeles Division, Contraband Interdiction and Investigations ("CI2") team.  The CI2 team is responsible for investigating controlled substances trafficked through the United States Mail.

5.    Since August 2019, I have participated in multiple investigations into violations of the Controlled Substances Act involving the United States Postal Service ("USPS") and discussed my investigations with other experienced law enforcement officers.  During my employment, I have written affidavits in support of complaints and search warrants, and executed numerous federal arrests, both as part of my own investigations and assisting in other investigations.  For these reasons, I am familiar with how drug traffickers use the mail to facilitate their trafficking.

## III. SUMMARY OF PROBABLE CAUSE

6.    **WILLIAMS** is a California state parole agent.  **WILIAMS** is believed to have mailed multiple packages containing cannabis from USPS facilities located in the Central District of California to locations across the country.  **WILLIAMS** also appears to have received packages mailed from across the country containing bulk cash.

2

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Identification of Suspicious Mailings**

7.    In approximately July 2020, USPS Inspector Versoza conducted a routine review of USPS databases and discovered that between approximately March 26, 2020, and May 11, 2020, the **SUBJECT PREMISES** received approximately thirteen USPS parcels. The parcels appeared suspicious to Inspector Versoza for the following reasons:

    a.    The parcels were being shipped using USPS Priority Mail and Priority Mail Express Service;

    b.    The relatively large volume of Priority Mail and Express Service packages were delivered to a residential address, as opposed to a business address, in a six-week period;

    c.    The parcels originated from a known drug destination state, Tennessee, to the Los Angeles area, a known major source area for drugs; and

    d.    All thirteen parcels had postage paid in cash which, in my training and experience, and my discussions with other law enforcement, is a common method of payment for drug traffickers in order to elude law enforcement by avoiding payment by check or credit card.

8.    Based upon my training and experience, drug distributors who utilize the USPS to ship drugs or drug proceeds often use USPS Priority Mail Express, which is the USPS overnight/next day delivery mail product, or Priority Mail Service, which is the USPS two-to-three day delivery mail product.  Drug distributors use the Priority Mail Express

3

delivery service because of its speed, reliability, and the ability to track the parcel's progress to delivery. Drug distributors may use the Priority Mail delivery service because it provides them more time for travel between states if they decide to follow their shipments to their destination for distribution. Also, by adding delivery confirmation to a Priority Mail parcel, drug traffickers have the ability to track the parcel's progress to the intended delivery point, as if the parcel had been mailed using the Priority Mail Express Service.

9. Inspector Versoza conducted a CLEAR[1] Search on the address of the **SUBJECT PREMISES** and the results indicated the name "Airris Williams" (**WILLIAMS**) was associated with the address.

10. The CLEAR database revealed **WILLIAMS** had a State of California registration as a correctional officer. An open source Transparent California search identified **WILLIAMS** as a Parole Agent in the State of California.

11. The USPS databases also contained information about the Internet Protocol ("IP") addresses that are used to track USPS parcels. Inspector Versoza reviewed the information in the database about the thirteen parcels described above and determined that IP address 68.170.71.186 (the "SUBJECT IP ADDRESS") had been used to track all thirteen parcels.

---

[1] CLEAR is a public information database used by law enforcement that provides names, addresses, telephone numbers, and other identifying information.

**B.    Investigation of PARCEL A**

12.    Following his review of the USPS database described
above, Inspector Versoza sought to inspect future parcels
shipped to the **SUBJECT PREMISES**.

13.    On or about August 18, 2020, Inspector Versoza
reviewed postal databases and identified a parcel set to be
delivered to the **SUBJECT PREMISES**.  On or about August 21, 2020,
Inspector Versoza and I observed the parcel bearing the tracking
number EJ 384 972 405 US ("PARCEL A") at the Chandler Station
Post Office, located at 11304 Chandler Boulevard, North
Hollywood, California, 91601.  When Inspector Versoza brought
PARCEL A to my attention I noticed it had several suspicious
characteristics that, when taken together, suggested the parcel
contained contraband.   Specifically:

    a.    PARCEL A was a USPS Priority Mail large flat rate
box; however it was shipped using USPS Priority Mail Express
mailing service.

    b.    The sender and recipient information was
handwritten.

    c.    PARCEL A was mailed using the Priority Mail
Express service with no business account number.

    d.    The seams of the parcel were all taped, which
based on my training and experience and conversations with other
law enforcement officers is indicative of the sender attempting
to conceal the possible smell of narcotics within the parcel.

    e.    The postage paid was cash which, in my training
and experience, and my discussions with other law enforcement,

is a common method of payment for drug traffickers in order to elude law enforcement by avoiding payment by a check or credit card that could be tied to the sender.

14.  I searched the CLEAR database using the sender name and sender address listed on PARCEL A: "Jonathon Sanders 1813 Rosebank Ave Nashville TN, 37216." [2]  The CLEAR search indicated the name "Jonathon Sanders" was not associated with the sender address listed on PARCEL A.

15.  I searched the CLEAR database using the recipient address listed on the PARCEL A: "Timothy Sanders 11136 Chandler Blvd Apt # 412 North Hollywood CA, 91601."  The CLEAR search indicated the name "Timothy Sanders" was not associated with the recipient address listed on PARCEL A.

16.  Later on August 21, 2020, Los Angeles Police Department ("LAPD") Officer Dolores Suviate and her trained drug-detection dog, "Smithy," examined the exterior of PARCEL A.

17.  I was present when Officer Suviate and Smithy examined PARCEL A.  Officer Suviate told me that Smithy positively alerted to PARCEL A, indicating the presence of drugs or other items such as the proceeds from the sale of drugs, which have been recently contaminated by or associated with the odor of drugs.

18.  On or about August 25, 2020, the Honorable Alka Sagar, U.S. Magistrate Judge, issued a warrant permitting a search of PARCEL A in 2:20-MJ-04033.  Pursuant to that warrant, on or

---

[2] When describing the sender and recipient addresses on the parcels in this affidavit, the spelling and capitalization are reproduced as shown on the parcel.

about August 26, 2020, Inspector Versoza and I opened PARCEL A and found that PARCEL A contained $24,500 in U.S. currency. In order not to prejudice the ongoing investigation, the currency was re-packaged inside PARCEL A and PARCEL A was returned to the mail stream so that it would be delivered to its intended recipient.

### C.   Investigation of PARCEL B

19.   On September 9, 2020, I was reviewing postal databases when I discovered the SUBJECT IP ADDRESS had been used to track a parcel bearing the tracking number 9405 5118 9956 4888 6755 72 ("PARCEL B") set to be delivered at the La Vergne Post Office, located at 5309 Murfreesboro Road, La Vergne, Tennessee 37086. I flagged PARCEL B as suspicious because it had several characteristics that suggested it contained contraband. Specifically:

a.   PARCEL B was being tracked by the SUBJECT IP ADDRESS.

b.   PARCEL B is a USPS Priority Mail box being shipped using USPS Priority Mail service.

c.   The sender and recipient information were written by hand.

d.   PARCEL B was mailed using Priority Mail with no business account number.

e.   The postage was paid utilizing the third-party service Stamps Endicia. In my training and experience, and my discussions with other law enforcement, I understand that drug traffickers often utilize third-party services to pay for

7

postage in order to elude law enforcement by avoiding paying for postage directly with USPS.

20. Shortly after flagging PARCEL B, I called the La Vergne Post Office and spoke with the Supervisor, who agreed to send PARCEL B back to me at the USPIS office in Los Angeles rather than delivering PARCEL B to its intended recipient.

21. On September 14, 2020, I received PARCEL B and noticed the seams of the parcel were taped, which is an additional suspicious characteristic.

22. After I received the PARCEL B, I searched the CLEAR database using the sender name and sender address listed on PARCEL B, which were "M. Shepherd 341 6th st. Burbank, CA 91501." The CLEAR search indicated the name "M. Shepherd" was not associated with the sender address listed on PARCEL B.

23. I searched the CLEAR database using the recipient name and address listed on PARCEL B, which was: "T. Shepherd 511 Nixon Way LA Vergne, TN 37086." The CLEAR search indicated the name "T. Shepherd" was not associated with the recipient address listed on PARCEL B.

24. On September 14, 2020, I asked LAPD Officer Vanessa Keortge and her trained drug-detection dog, "Cobra," to examine the exterior of PARCEL B.

25. I was present when Officer Keortge and Cobra examined PARCEL B. Officer Keortge told me that Cobra positively alerted to PARCEL B, indicating the presence of drugs or other items such as the proceeds from the sale of drugs, which have been recently contaminated by or associated with the odor of drugs.

26.   On or about September 16, 2020, the Honorable Pedro V. Castillo, U.S. Magistrate Judge, issued a warrant permitting a search of PARCEL B in 2:20-MJ-04413.   Pursuant to that warrant, on or about September 16, 2020, USPIS Inspector Perez and I opened PARCEL B and found that PARCEL B contained approximately 1,015 gross grams of suspected marijuana vape cartridges and 2,347 gross grams of suspected cannabis infused gummies, both of which were seized and stored as evidence.

**D.   SUBJECT IP ADDRESS Resolves Back to SUBJECT PREMISES**

27.   Shortly after the opening of PARCEL B, I reviewed postal databases and confirmed that the SUBJECT IP ADDRESS had been used to track both PARCEL A and PARCEL B.

28.   On September 23, 2020, I reviewed subscriber information for the SUBJECT IP ADDRESS provided by Bel Air Internet.   The subscriber information returned to customer Airris WILLIAMS (**WILLIAMS**) and revealed the internet service was for the **SUBJECT PREMISES**.

**E.   SUBJECT IP ADDRESS Used to Track Additional Parcels**

29.   I reviewed the USPS database and determined that between September 3, 2020, and March 22, 2021, the SUBJECT IP ADDRESS tracked approximately forty-five parcels, including thirty-three parcels sent from California to locations in Tennessee, Michigan, Florida, and Northern California (from Southern California).   Many of the parcels were sent to the same location.   A table of all of the locations is included below:

| Date of Shipment | Destination |
|---|---|
| 12/9/2020 | 3001 HAMILTON CHURCH RD UNIT 419 ANTIOCH, TN 37013 |
| 12/9/2020 | 4220 LEBANON PIKE, Hermitage, TN 37076 |
| 12/9/2020 | 4220 LEBANON PIKE, Hermitage, TN 37076 |
| 12/9/2020 | 800 BURR ST GARY, IN 46406 |
| 12/9/2020 | 4405 WHEATLEY ST ORLANDO, FL 32811 |
| 12/11/2020 | 549 PHIPPS DR NASHVILLE, TN 37218 |
| 12/16/2020 | 2110 LENNINGTON DR FLINT, MI 48532 |
| 12/21/2020 | 241 BUCK RUN DR NASHVILLE, TN 37214 |
| 12/23/2020 | 1006 WESLEYVILLE ST NASHVILLE, TN 37217 |
| 12/26/2020 | 511 NIXON WAY LA VERGNE, TN 37086 |
| 12/30/2020 | 2110 LENNINGTON DR FLINT, MI 48532 |
| 12/31/2020 | 3001 HAMILTON CHURCH RD UNIT 419, ANTIOCH, TN 37013 |
| 12/31/2020 | 4405 WHEATLEY ST ORLANDO, FL 32811 |
| 1/2/2021 | 549 PHIPPS DR, NASHVILLE, TN 37218 |
| 1/2/2021 | 4220 LEBANON PIKE, Hermitage, TN 37076 |

| Date of Shipment | Destination |
|---|---|
| 1/14/2021 | 2110 LENNINGTON DR FLINT, MI 48532 |
| 1/14/2021 | 3806 Forest Hill Avenue, Flint, MI 48504[3] |
| 1/15/2021 | 511 NIXON WAY LA VERGNE, TN 37086 |
| 2/11/2021 | 8514 RICE CT, STOCKTON, CA 95212 |
| 2/16/2021 | 2110 LENNINGTON DR FLINT, MI 48532 |
| 2/16/2021 | 2110 LENNINGTON DR FLINT, MI 48532 |
| 2/22/2021 | 4220 LEBANON PIKE, Hermitage, TN 37076 |
| 2/22/2021 | 3001 HAMILTON CHURCH RD UNIT 421, ANTIOCH, TN 37013 |
| 3/1/2021 | 3718 Forest Hill Avenue, Flint, MI 48504[4] |
| 3/1/2021 | 3910 FOREST HILL AVE, FLINT, MI 48504 |
| 3/9/2021 | 3213 BROOKMONT CIR, ANTIOCH, TN 37013 |
| 3/9/2021 | 3213 BROOKMONT CIR, ANTIOCH, TN 37013 |
| 3/20/2021 | 2110 LENNINGTON DR FLINT, MI 48532 |

---

[3] The parcel image for this package was cut off; GPS coordinates provided this address as an estimated delivery location.

[4] The parcel image for this package was cut off; GPS coordinates provided this address as an estimated delivery location.

| Date of Shipment | Destination |
|---|---|
| 3/20/2021 | 2110 LENNINGTON DR FLINT, MI 48532 |
| 3/22/2021 | 3001 HAMILTON CHURCH RD UNIT 419, ANTIOCH, TN 37013 |
| 3/22/2021 | 3001 HAMILTON CHURCH RD UNIT 419, ANTIOCH, TN 37013 |
| 3/22/2021 | 4220 LEBANON PIKE, Hermitage, TN 37076 |
| 3/22/2021 | 4220 LEBANON PIKE, Hermitage, TN 37076 |

**F.   Suspect Parcels Mailed By Someone Resembling WILLIAMS**

30.   I reviewed postal databases for packages tracked by the SUBJECT IP ADDRESS and noted that the postage for some of those packages had been paid for using cash and other were paid for using pre-paid debit cards.

31.   Between September 3, 2020, and December 16, 2020, postage for twenty-one parcels tracked by the SUBJECT IP ADDRESS was paid with cash.  I randomly selected and retrieved surveillance footage for the cash transactions for five of those parcels.  In the footage, I observed an individual bearing physical resemblance to **WILLIAMS** paying for shipping services with cash for each of the five parcels, which were mailed out on or about September 3, 2020; September 8, 2020; November 13, 2020; November 16, 2020; and November 28, 2020.

32.   Between December 23, 2020, and March 22, 2021, postage for twenty-four parcels tracked by the SUBJECT IP ADDRESS was

paid utilizing pre-paid debit card payments at postal self-service kiosks.  I randomly selected and retrieved surveillance images of three of those parcels.  In the images, I observed an individual bearing a physical resemblance to **WILLIAMS** paid for shipping services for each of the three parcels, which were mailed out on or about December 31, 2020; January 14, 2021; and March 20, 2021.

       **G.   Investigation of PARCEL C and PARCEL D**

     33.  On or about March 21, 2021, I was reviewing postal databases when I discovered the parcel bearing tracking number 9505 5065 8601 1079 2941 41 ("PARCEL C") and parcel bearing tracking number 9505 5065 8601 1079 2941 65 ("PARCEL D") were being tracked by someone using the SUBJECT IP ADDRESS.

     34.  Both PARCEL C and PARCEL D were suspected to be mailed from the same self-service kiosk at the Chandler Station Post Office located at 11304 Chandler Boulevard, North Hollywood, California, 91601.

     35.  In the USPS database, I reviewed an image of PARCEL C, which indicated that PARCEL C had the following suspicious characteristics:

          a.   PARCEL C was being tracked by the SUBJECT IP ADDRESS.

          b.   PARCEL C was a USPS Priority Mail large, flat-rate box being shipped using USPS Priority Mail service.

          c.   The sender and recipient information was written by hand.

d.   PARCEL C was mailed using Priority Mail service with no business account number.

36.  I searched the CLEAR database using the sender address listed on PARCEL C, which was "B. FERGUSON 18147 ArchwooD St. RESEDA, cA 91335." The CLEAR search revealed that the name "B. FERGUSON" was not associated with the sender address listed on PARCEL C.

37.  I searched the CLEAR database using the recipient address listed on PARCEL C, which was "JASON FERGUSON 2110 LENNINGTON DR. FLINT, MI 48532."  The CLEAR search revealed that the name "JASON FERGUSON" was not associated with the recipient address listed on PARCEL C.

38.  In the USPS database, I reviewed an image of PARCEL D, which indicated that PARCEL C had the following suspicious characteristics:

a.   PARCEL D was being tracked by the SUBJECT IP ADDRESS.

b.   PARCEL D was a USPS Priority Mail large, flat-rate box being shipped using USPS Priority Mail service.

c.   The sender and recipient information was written by hand.

d.   PARCEL D was mailed using Priority Mail service with no business account number.

39.  PARCEL D also shared the same sender name, "B. FERGUSON" and the same sender address, "18147 Archwood st. Reseda, cA 91335" that was found on PARCEL C, with some minor capitalization differences.  PARCEL D also shared the same

14

recipient address "2110 LENNINGTON DR. FLINT, MI 48532" that was found on PARCEL C.

40.   Shortly after flagging PARCEL C and PARCEL D as suspicious, I called the post office in Michigan and spoke with the supervisor.  At my request, the supervisor sent the two parcels back to me at the USPIS office located in Los Angeles for further investigation.

41.   On March 30, 2021, I received PARCEL C and PARCEL D and noticed that on PARCEL D, the name "STACEY FERGUSON" was listed in recipient section of the parcel, which was different from the name found in the recipient section on PARCEL C -- "JASON FERGUSON".

42.   I searched the CLEAR database using the sender address listed on PARCEL D, which was "B. FERGUSON 18147 Archwood st. Reseda, cA 91335."  The CLEAR search revealed that the name "B. FERGUSON" was not associated with the sender address listed on PARCEL D.

43.   I searched the CLEAR database using the recipient address listed on PARCEL D, which was: "STACEY FERGUSON 2110 LENNINGTON DR. FLINT, MI 48532."  The CLEAR search revealed that the name "STACEY FERGUSON" was not associated with the recipient address listed on PARCEL D.

44.    I noticed that PARCEL C and PARCEL D were both taped, which indicates that the sender attempted to conceal the possible smell of narcotics within the parcel.

45.  On or about March 30, 2021, I asked LASD Officer
Jessie Zuniga and his trained drug-detection dog, "Fury," to
examine the exterior of PARCEL C and PARCEL D, separately.

46.  I was present when Officer Zuniga and Fury examined
the two parcels.  Officer Zuniga told me that Fury positively
alerted to PARCEL C and PARCEL D, separately, indicating the
presence of drugs or other items such as the proceeds from the
sale of drugs, which have been recently contaminated by or
associated with the odor of drugs.

47.  On or about April 1, 2021, the Honorable Alexander F.
MacKinnon, U.S. Magistrate Judge, issued a warrant permitting a
search of PARCEL C and PARCEL D in 2:21-MJ-1585.  Pursuant to
that warrant, on April 2, 2021, I opened PARCEL C and PARCEL D.
PARCEL C contained approximately 995 gross grams of a green
leafy substance suspected to be marijuana, and PARCEL D
contained approximately 1,015 gross grams of a green leafy
substance suspected to be marijuana.  The contents of PARCEL C
and PARCEL D were seized and stored as evidence.

48.  On or about April 12, 2021, I retrieved surveillance
footage from the Chandler Station Post Office in regards to
PARCEL C and PARCEL D.  In the footage, an individual bearing
resemblance to **WILLIAMS** can be seen exiting what appears to be a
black Mercedes Benz E Class sedan and entering the Post Office
lobby.

49.  Once in the lobby, the individual can be seen paying
for parcel postage at a self-service kiosk.  The individual
utilizes what is suspected to be a pre-paid debit card as

payment and removes two parcel labels from the kiosk, that were used for PARCEL C and PARCEL D. The individual is then seen taking two disassembled postal boxes from the lobby and returning to the vehicle.

**H.   WILLIAMS Lives at the SUBJECT PREMESIS**

50.   On or about April 7, 2021, I conducted an address check of the **SUBJECT PREMESIS** and discovered the name A. Williams on the resident directory for the apartment building located at 11136 Chandler Boulevard, North Hollywood, California, 91601.

51.   On or about April 12, 2021, I conducted surveillance at the **SUBJECT PREMESIS** and discovered two cars, both registered to **WILLIAMS**, parked in the resident parking section of the underground parking garage.

52.   The first vehicle was a 1998 black Honda Civic LX bearing the California license plate 4DFY830.

53.   The second vehicle was a 2018 black Mercedes Benz E Class sedan bearing the California license plate 8JPR331. This black Mercedes appeared to be the same vehicle referenced in paragraph 47.

54.   On April 13, 2021, I utilized postal databases to find images of parcels that were delivered to the **SUBJECT PREMISES**. Between December 23, 2020 and April 1, 2020, approximately fifteen parcels were delivered to the **SUBJECT PREMISES**, all of which were addressed to **WILLIAMS**.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

55.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

56.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

57.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

58.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos

and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

59.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

60.  Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

61.  Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

62.  Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

63.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

64.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

   65.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data

during a search of the premises for a number of reasons,
including the following:

      a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

      b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

   66.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

      a.  Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

67.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **WILLIAMS**'s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of **WILLIAMS**'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

68.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

23

**VII.**

69.   For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of **WILLIAMS** and the **SUBJECT PREMISES**, as described in Attachments A-1 and A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __4th__ day of May,
2021.

_____
HONORABLE   ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

24

**ATTACHMENT A-2**

LOCATION TO BE SEARCHED

The residence located at 11136 Chandler Boulevard, Apartment 412, North Hollywood, California 91601(the "SUBJECT PREMISES").

The SUBJECT PREMISES is described as a studio apartment. The front door of the SUBJECT PREMISES is dark-grey colored. The exterior of the SUBJECT PREMISES is light-grey colored. The number 412 is present outside the residence on the wall to the right of the front door. Behind the SUBJECT PREMISES is a patio that is fenced in by a short steel fence. The SUBJECT PREMISES is located on the fourth floor of a four-story apartment building with an underground garage.  The apartment building can be accessed via keycard, from the garage and first floor levels.

A Photograph of the exterior of the SUBJECT PREMISES appears below:



## ATTACHMENT B

### I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute a Controlled Substance), 846 (Conspiracy to Commit Controlled Substance Offense), 843(b) (Unlawful Use of a Communication Facility, Including the Mails, to Facilitate the Distribution of a Controlled Substance), and 18 U.S.C. § 1956 (Money Laundering) (the "Subject Offenses"), namely:

a. Any controlled substance, controlled substance analogue, or listed chemical;

b. Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c. Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d. Items used in the mailing of controlled substances, or proceeds thereof, such as U.S. Mail, Express Mail, Priority Mail, United Parcel Service (UPS), Federal Express or other private shipping service's delivery confirmation slips, and labels and associated boxes (to include

any packages and envelopes delivered while the search is being conducted).

   e. United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

   f. Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

   g. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers

accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

      i.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named Vany iolations;

      j.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

      k.   Contents of any calendar or date book;

      l.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      m.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

      n.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser

history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

   2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

   3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

   4.   In searching digital devices (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated
techniques.

      c.   The search team will not seize contraband or
evidence relating to other crimes outside the scope of the items
to be seized without first obtaining a further warrant to search
for and seize such contraband or evidence.

      d.   If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

      f.   If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

      g.   The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

        h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

        5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

        6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

        a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

        b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

        c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.  Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.  Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.  Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.  Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

2.  During the execution of this search warrant, law enforcement is permitted to: (1) depress **WILLIAMS**'s thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of **WILLIAMS**'s face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

EXHIBIT B

1        Your Affiant is Brett Coffey, Serial No. 38679.  Your
2   affiant has been a Los Angeles Police Officer since 2007, and is
3   currently assigned to Gang and Narcotics Division, K-9 Squad.
4   Your Affiant has attended numerous classes, seminars, training
5   lectures and on the job training in the field of narcotics given
6   by other narcotics experts.  These experts are from varied areas
7   of narcotics enforcement including LAPD, DEA, FBI, and other
8   agencies. Your Affiant, has attend and completed the Los Angeles
9   Police Department 40- hour academy narcotic training (sales,
10  packaging, usage); a post certified 2-day Narcotics training
11  course for 11550 and 11532 H&S, loitering for the purpose of
12  sales or purchasing narcotics.
13       Your Affiant has worked various specialized units for over
14  ten years and has directly made, participated in/or assisted in
15  over 200 various narcotic related arrest/violations, the bulk of
16  which were for possession and possession for sales of various
17  controlled substances. Your Affiant has worked under and is
18  currently working under the direction of senior narcotic
19  enforcement officers. Your Affiant has observed first hand, the
20  methods used by street dealers and users in the course of using,
21  buying, selling, transporting, packaging for sales and sales of
22  narcotics.
23       Your Affiant is currently a member of NPCA (National Police
24  Canine Association). In January of 2019, your Affiant was
25  assigned to the Gang and Narcotics Division, K-9 Squad. On
26  September 3rd, 2020, your Affiant assumed the responsibility of
27  canine "Pete" #K9-298, a LAPD narcotics detection canine.  Your
28  Affiant's responsibilities consist of the care, training and

29   handling of the canine.  "Pete" has received over (380) hours of

30   training, during which time he has successfully found over

31   (1100) training aids, which consists of actual narcotics.

32   "Pete" alerts on the scent of narcotics, in which he is

33   imprinted on.  His alert consists of physical and behavioral

34   reactions, which includes a heightened emotional state in which

35   he focuses (stares) on the source of the scent and he becomes

36   very possessive of the area. "Pete" will positively alert his

37   handler to the scent of heroin, cocaine (Base and Powder),

38   methamphetamine, and marijuana.

39       "Pete" and your Affiant were first certified by the

40   National Police Canine Association on November 19th, 2020. "Pete"

41   and your Affiant had their most recent certification by The

42   National Police Canine Association on November 19th, 2020.

43       On **May 21st, 2021** your Affiant responded to a request for a

44   narcotic detection canine.  "Pete" alerted to the scent of

45   narcotics on or in:

46   **Outbound USPS Priority Parcel Tracking #9505 5150 7296 1132 9291**

47   **04 at 1055 N Vignes St**

48   I declare under the penalty of perjury that all of the above is

49   true and correct.  Executed at **10:00 am** on the 21st day of **May** in

50   **Los Angeles** County.

51   _____

52                Officer Brett Coffey #38679

53   //

54   //

55   //

56   //